**Opinion issued August 6, 2020**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

## NO. 01-18-00548-CV

———————————

**MADISON DEVELOPMENT GROUP LLC, QUATTRO DEVELOPMENT, LLC, AND MICHAEL LIYEOS, Appellants**

**V.**

**MATTRESS FIRM, INC., Appellee**

---

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-73196**

---

## O P I N I O N

In this case, appellee, Mattress Firm, Inc., sued multiple defendants, including appellants Madison Development Group LLC (Madison), Quattro Development, LLC (Quattro), and Michael Liyeos, arising out of an alleged multi-year fraudulent

scheme involving bribes and kickbacks paid to Mattress Firm insiders by real estate brokers and property development companies in an effort to charge Mattress Firm artificially inflated rental rates on leases throughout the country. Mattress Firm brought claims for fraud, civil conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and negligence. It also alleged that the defendants had been unjustly enriched, and it sought the imposition of a constructive trust. Most of the defendants generally appeared in the underlying lawsuit. Madison, Quattro, and Liyeos, however, are all nonresidents of Texas and they filed special appearances.

After a hearing, the trial court denied all three appellants' special appearances. On appeal, each of the appellants contends that the trial court erred in denying their respective special appearances because they lack minimum contacts with Texas such that maintenance of the suit against them in Texas fails to comport with due process. Madison also argues that exercising personal jurisdiction over it would offend traditional notions of fair play and substantial justice.

We affirm.

## Background

Mattress Firm is a Delaware corporation with its principal place of business in Houston, Texas, and it sells mattresses and other bedding materials in retail stores nationwide. Generally, Mattress Firm does not own the real property on which it has

2

retail stores. Instead, "independent real estate developers" own and develop the property, and Mattress Firm enters into a lease with the developer, or a "special purpose entity" owned by the developer, to operate a retail store on the property. Mattress Firm has a Real Estate Committee (the Committee) that regularly meets in Houston and determines which leases to approve.

In 2009, Mattress Firm embarked on a period of rapid expansion throughout the United States, and it made several internal hires to facilitate this expansion. It hired Bruce Levy as Vice President of Real Estate and Construction "to lead the national leasing efforts," and it hired Ryan Vinson as Director of New Market Development. Levy later became Executive Vice President of Real Estate, and Vinson later became Senior Vice President of Real Estate. On Levy's recommendation, Mattress Firm hired Alexander Deitch and the real estate brokerage firm that employed him, Colliers International—Atlanta, LLC (Colliers Atlanta), to serve as Mattress Firm's "Master Broker," primarily responsible for "identifying, evaluating, and brokering new site locations and advising and negotiating new leases and lease renewals on behalf of Mattress Firm." Levy, Vinson, Deitch, and Colliers Atlanta were responsible for evaluating potential locations for new retail stores and for recommending to senior management at Mattress Firm, including the Committee, which retail stores to open and where, lease terms for these stores, construction budgets, which leases to renew, and which stores

to close. Levy, Vinson, Deitch, and Colliers Atlanta are all defendants in the underlying lawsuit but are not parties to this interlocutory appeal.

According to Mattress Firm, Levy, Vinson, Deitch, and Colliers Atlanta joined with real estate development companies and their principals—including appellants Madison Development, Quattro Development, and Michael Liyeos, one of Quattro's principals—to engage "in a nationwide bribery, kickback, and fraud scheme to financially enrich themselves at Mattress Firm's expense." To secure their position as "Master Broker," Deitch and Colliers Atlanta paid bribes and kickbacks to Levy and Vinson. Levy and Vinson also used "preferred developers"—real estate development companies that were also willing to pay bribes and kickbacks, often disguised as "brokerage fees" or "development fees," to Levy, Vinson, and Deitch—to develop properties nationwide, and these developers "were given the largest number of Mattress Firm leases with very favorable lease terms, including above-market rents and longer lease terms." The developer-friendly leases increased the value of the properties, allowing the developers (or entities controlled by the developers) to sell their properties at a substantial profit several months after entering into a lease with Mattress Firm.

As part of the alleged fraudulent scheme, Levy, Vinson, Deitch, and the development companies worked together to identify properties for new retail stores, negotiate long lease terms, and set inflated rental rates for new store locations that

4

were beneficial to the development companies but detrimental to Mattress Firm. Levy, who "controlled the real estate transactions for the company," ensured that the Committee would approve the leases at the agreed-upon terms through misrepresentations and omissions about the nature of the transactions, including misrepresenting "[t]he need to pay at the high end of the market, or above, to secure a lease location," "the fact that there were no secret side deals to secure the lease location," "that there were no conflicts of interests that would require the transaction to be subject to closer scrutiny," and "that the lease rates were reasonable and the best deal possible under the circumstances."

In October 2017, Mattress Firm filed suit against seventeen defendants, including the three appellants here—Madison, Quattro, and Liyeos.[1] Madison is a Washington limited liability company with its principal place of business in Washington. Quattro is an Illinois limited liability company with its principal place of business in Illinois, and Liyeos is a member of Quattro and an Illinois resident.

---

[1]    Mattress Firm also sued Levy, Vinson, Deitch, Colliers Atlanta, Preferred Realty, LLC, Chase Ventures LLC, ABR Investment, LLC, Preferred Developers, LLC, Terra Consulting II, LLC, Win-Development, L.L.C., Owen C. Ewing, and Jesse McInerney. All of these defendants generally appeared and are not parties to this interlocutory appeal. Mattress Firm also sued Oldacre McDonald, LLC and Mark McDonald. These two defendants specially appeared and, after the trial court denied their special appearances, were originally parties to this interlocutory appeal. Oldacre McDonald, LLC and Mark McDonald reached a settlement agreement with Mattress Firm, and a panel of this Court dismissed these two defendants from this appeal on January 24, 2019.

Mattress Firm asserted a cause of action for common-law fraud against "all defendants" named in its petition. Mattress Firm alleged that Levy, Vinson, Deitch, and Colliers Atlanta knowingly made material misrepresentations and omissions to Mattress Firm, including failing to disclose kickbacks, using "a network of single purpose LLCs, partnerships, or other entities intended to conceal the unlawful activity," and providing inaccurate comparable lease information to Mattress Firm to induce it to "pay millions in brokerage commissions and above-market rents." It also asserted a cause of action for civil conspiracy against "all defendants," alleging that the real estate development companies—including Madison and Quattro—acted in concert to defraud Mattress Firm. Mattress Firm alleged that the development companies knew that Levy, Vinson, Deitch, and Colliers Atlanta were engaged in a scheme to defraud Mattress Firm "out of millions of dollars in excess rents and other expenses through materially false and inaccurate real estate reports and representations to [the Committee] and by hiding kickbacks and other costs that served to inflate Mattress Firm's lease expenses . . . ."

Mattress Firm alleged that all of the defendants had been unjustly enriched as a result of their respective actions, and it sought the imposition of a constructive trust. With respect to the development companies, including Madison and Quattro, Mattress Firm alleged that it had conferred upon them "multiple non-gratuitous payments in the form of above-market rents that were provided in exchange for the

6

kickbacks given to former Mattress Firm employees Levy and Vinson, which information was concealed and misrepresented to Mattress Firm," allowing the development companies "to 'flip' the properties for substantial profits, which they retained."

Mattress Firm asserted a claim for breach of fiduciary duty against its two former employees—Levy and Vinson—and alleged that the other defendants, including Madison and Quattro, were liable for aiding and abetting Levy's and Vinson's breach of their fiduciary duties. Specifically, Mattress Firm alleged that the development companies knew that Levy and Vinson "held positions of trust and confidence" at Mattress Firm, but they "illegally capitalized on the positions of authority held by Levy and Vinson for their own personal gain." Finally, Mattress Firm asserted a cause of action for negligence against Colliers Atlanta.

In its second amended petition—its live pleading—Mattress Firm alleged certain acts by Madison, Quattro, and Liyeos that connected each of these defendants to Texas. Mattress Firm alleged that, while the fraudulent scheme was ongoing, Quattro entered into at least twenty leases with Mattress Firm, including one for a retail store in Lubbock, Texas. In March 2013, Liyeos and Rob Walters[2] toured several cities in West Texas with Levy and Vinson, including a property in Lubbock

---

[2] Walters is the other member of Quattro, in addition to Liyeos, and he is not a party to the underlying lawsuit.

that a Quattro-affiliated company later purchased. Through an email to Levy, Quattro solicited Mattress Firm's interest in this property. Levy and Vinson approved the deal "and then pushed it through the [Committee] approval process with Quattro's and Deitch's assistance." Although Mattress Firm was in the process of leasing a second property less than one mile away at a rate of $12 per square foot, Quattro, Levy, Vinson, and Deitch agreed that Mattress Firm would lease the new location at a rate of $34 per square foot, a price "well above market." Quattro, Levy, and Vinson knew that the rental rate for the Lubbock store was above-market and not favorable to Mattress Firm, especially compared to the other retail store in the area, but Levy and Vinson "pushed the Quattro lease through the [Committee] approval process." Quattro used a special purpose entity—Quattro Lubbock, LLC— to purchase the real property for the store, and a second Quattro-affiliated entity— Quattro Springfield, LLC—executed the lease for the store with Mattress Firm.

With respect to Madison, Mattress Firm alleged that it entered into at least seventeen development deals with Mattress Firm, including two in Spokane, Washington, that had lease terms significantly longer than Mattress Firm's average and higher rental rates relative to other Mattress Firm stores in the same market. Mattress Firm alleged that Madison worked behind-the-scenes with Levy to negotiate lease terms that were favorable to Madison, which Levy would then push through the Committee for approval, ensuring that Madison would later be able to

8

sell the property at a substantial profit. Mattress Firm alleged the following with respect to the two properties that Madison developed for Mattress Firm in Spokane:

> [Madison] secured its position as a Preferred Developer, and some of its earliest deals, at a meeting at Mattress Firm's headquarters in Houston, Texas. In May of 2012, when Madison Development was first establishing its relationship with Mattress Firm, Jim Gallaugher, co-founder of Madison Development, traveled to Houston to participate in a [Committee] meeting to pitch how Madison Development could assist Mattress Firm in its efforts to expand in the Washington market. Although Gallaugher may not have actually made the presentation to the [Committee], he helped Jim Quigley, the presenter, come up with the market strategy for Washington to be presented to the [Committee].

> During the presentation, two Washington properties were discussed on which Madison Development ultimately closed with Mattress Firm . . . . Quigley, who made the presentation to the [Committee], was Mattress Firm's local broker on both of these deals. Together, Gallaugher and Quigley pitched these deals to the [Committee] in Houston, Texas, as well as Madison Development's efforts to expand Mattress Firm's presence in Washington state.

> During the meeting, Gallaugher provided Mattress Firm with information about the rental rates in these areas. After the meeting, Gallaugher treated Levy and John Broses [a Mattress Firm employee] to dinner, where he continued to pitch [the properties] as great deals. Mattress Firm ultimately entered into leases on [the properties], but neither were great deals for Mattress Firm as falsely represented by Gallaugher in Houston, Texas. Instead, the leases contained above-market rents which had the effect of increasing Madison Development's profits on the deals at Mattress Firm's expense.

Mattress Firm alleged that Levy "fast tracked" the Washington leases through the Committee approval process, "ensur[ing] that the transactions would receive little scrutiny from the [Committee], making the [Committee] entirely dependent on Levy's recommendation to approve the leases." Mattress Firm alleged that Madison,

through two affiliated companies, sold the properties within one year of purchase and made a profit of nearly $2 million for each property. Mattress Firm alleged that Madison offered gifts to Levy, Vinson, and Deitch and "rewarded" them "for their services with a suite at a Dallas Cowboys game, complete with Emmitt Smith in attendance."

Madison, Quattro, and Liyeos all filed special appearances, arguing that they were nonresidents of Texas and the trial court could not, consistent with federal due process guarantees, exercise either general or specific personal jurisdiction over them. Madison supported its special appearance with the declaration of Jim Gallaugher, and Quattro and Liyeos supported their special appearance with the affidavit of Liyeos. Madison and Quattro both acknowledged that they had a business relationship with Mattress Firm, a Texas company, but they had not committed any torts in Texas. The defendants argued that all of their contacts with Texas were the result of Mattress Firm's unilateral decision to base its headquarters in Houston, the contacts were not the result of any purposeful actions by the defendants, and the contacts did not have a substantial connection to the causes of action asserted against them. Madison further argued that, even if it had purposefully established contacts with Texas and even if Mattress Firm's causes of action against it had a substantial connection to those contacts, maintaining suit against it in Texas

would be unduly burdensome and exercising personal jurisdiction would offend traditional notions of fair play and substantial justice.

Mattress Firm responded to both special appearances and argued that all three defendants were subject to specific jurisdiction because they purposefully availed themselves of the privileges of doing business in Texas. Mattress Firm attached evidence relating to its deals with Madison and Quattro, including email correspondence between the principals of both companies and Mattress Firm personnel, internal Mattress Firm emails relating to the Lubbock property and both Spokane properties, a copy of the PowerPoint presentation given at the Committee meeting that Gallaugher attended, draft Letters of Intent relating to these three properties, the lease agreements concerning these three properties, documents relating to the later sale of the Spokane properties by Madison-affiliated companies, and a guaranty agreement concerning the Lubbock property.

After a hearing, the trial court denied Madison's, Quattro's, and Liyeos's special appearance. This interlocutory appeal followed.

## Special Appearance

Madison, Quattro, and Liyeos all argue that the trial court erred by denying their special appearances because they do not have sufficient minimum contacts with Texas to support the exercise of personal jurisdiction over them. They argue that, to the extent they do have purposeful contacts with Texas, there is no substantial

11

connection between those contacts and Mattress Firm's causes of action that would justify exercising personal jurisdiction. Finally, Madison argues that even if its contacts with Texas support personal jurisdiction, exercising jurisdiction over it would offend traditional notions of fair play and substantial justice.

## A.     *Standard of Review and Governing Law*

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018); *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017). When, as here, the trial court does not issue findings of fact and conclusions of law relating to its decision on a special appearance, we imply all relevant facts necessary to support the judgment that are supported by evidence. *Bell*, 549 S.W.3d at 558 (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).

Texas courts may exercise personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with state and federal due-process guarantees. *Id.* (quoting *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013)). The long-arm statute permits Texas courts to exercise jurisdiction over a nonresident defendant that "does business" in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042; *BMC Software*, 83 S.W.3d at 795. Under the long-arm statute, a

nonresident does business in Texas if the nonresident commits a tort in whole or in part in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(1)–(2); *Bell*, 549 S.W.3d at 558–59. "However, allegations that a tort was committed in Texas do not necessarily satisfy the United States Constitution." *Bell*, 549 S.W.3d at 559.

To establish personal jurisdiction over a nonresident defendant, federal due process standards require that the defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). A defendant establishes minimum contacts with a forum state when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009). The defendant's activities "must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Bell*, 549 S.W.3d at 559; *Retamco Operating*, 278 S.W.3d at 338; *see TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016) ("Due process requires purposeful availment because personal jurisdiction 'is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there.'") (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)).

When determining whether a defendant has purposefully availed itself of the privilege of conducting activities in Texas, we consider three factors:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. . . . Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Bell*, 549 S.W.3d at 559 (quoting *Moncrief Oil Int'l*, 414 S.W.3d at 151); *TV Azteca*, 490 S.W.3d at 38 (stating that defendant's contacts must be "purposefully directed" to Texas and "must result from the defendant's own 'efforts to avail itself of the forum'"). A nonresident may purposefully avoid a jurisdiction "by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Michiana Easy Livin' Country*, 168 S.W.3d at 785. We assess the quality and the nature of the contacts, not the quantity. *TV Azteca*, 490 S.W.3d at 38.

A defendant's contacts with the forum may give rise to either general or specific jurisdiction. *Bell*, 549 S.W.3d at 559; *M & F Worldwide*, 512 S.W.3d at 885. General jurisdiction, which is not at issue in this case,[3] is established when a defendant's contacts with the state "are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *M & F Worldwide*, 512 S.W.3d at 885

---

[3] Mattress Firm stated, in both its responses to the special appearances and in its briefs on appeal, that it does not contend that any of the three appellants are subject to general jurisdiction in Texas.

14

(quoting *Goodyear Dunlop Tires Operations, SA v. Brown*, 564 U.S. 915, 919 (2011)).

Specific jurisdiction, which is the focus of this case, exists when the cause of action arises from or is related to a defendant's purposeful activities in the state. *Bell*, 549 S.W.3d at 559. For a Texas court to exercise specific jurisdiction over a nonresident defendant, (1) the defendant's contacts with Texas must be purposeful, and (2) the cause of action must arise from those contacts. *Id.* (quoting *Michiana Easy Livin' Country*, 168 S.W.3d at 795); *see Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 1780 (2017) (stating that, for specific jurisdiction to exist, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation" and that specific jurisdiction "is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction"). The defendant's purposeful contacts "must be substantially connected to the operative facts of the litigation or form the basis of the cause of action." *Bell*, 549 S.W.3d at 559–60 (citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007)); *see Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State.").

In analyzing specific jurisdiction, we focus on the relationship between the forum, the defendant, and the litigation. *Bell*, 549 S.W.3d at 559; *Walden*, 571 U.S. at 285 ("[O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."). "[A] defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties," but "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Walden*, 571 U.S. at 286. Specific jurisdiction must be established on a claim-by-claim basis unless all of the asserted claims arise from the same contacts with the forum. *M & F Worldwide*, 512 S.W.3d at 886; *Moncrief Oil Int'l*, 414 S.W.3d at 150–51.

When personal jurisdiction is challenged, the plaintiff and the nonresident defendant bear shifting burdens of proof. *Bell*, 549 S.W.3d at 559; *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the scope of Texas's long-arm statute. *Bell*, 549 S.W.3d at 559; *Kelly*, 301 S.W.3d at 658 ("Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading."). The trial court may consider the plaintiff's original pleadings as well as its response to the defendant's special appearance in

determining whether the plaintiff satisfied its initial burden. *Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.). If the plaintiff fails to plead facts bringing the defendant within the reach of the long-arm statute, "the defendant need only prove that it does not live in Texas to negate jurisdiction." *Kelly*, 301 S.W.3d at 658–59. In conducting our review, we accept as true the allegations in the petition. *Touradji*, 316 S.W.3d at 23.

If the plaintiff meets its initial pleading burden, the burden shifts to the defendant to negate all bases of personal jurisdiction alleged by the plaintiff. *Bell*, 549 S.W.3d at 559; *Kelly*, 301 S.W.3d at 658. The defendant can negate jurisdiction on either a factual or a legal basis. *Kelly*, 301 S.W.3d at 659. Factually, the defendant can present evidence that it has no contacts with Texas, "effectively disproving the plaintiff's allegations." *Id.* The plaintiff can then respond with its own evidence affirming its allegations, and if it does not present evidence establishing personal jurisdiction, it risks dismissal of its suit. *Id.* Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; that the defendant's contacts with Texas do not constitute purposeful availment; for specific jurisdiction, that the claims do not arise from contacts with Texas; or that the exercise of jurisdiction offends traditional notions of fair play and substantial justice. *Id.*

17

The Texas Supreme Court has held that "[t]he mere existence or allegation of a conspiracy directed at Texas is not sufficient to confer jurisdiction." *Bell*, 549 S.W.3d at 560; *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995). Jurisdiction may not be premised "solely upon the effects or consequences of an alleged conspiracy in the forum state"; instead, it is the defendant's conduct and connection with the forum that is critical. *Michiana Easy Livin' Country*, 168 S.W.3d at 789. Furthermore, "[j]urisdiction cannot turn on whether a defendant denies wrongdoing—as virtually all will. Nor can it turn on whether a plaintiff merely alleges wrongdoing—again as virtually all will." *Bell*, 549 S.W.3d at 560 (quoting *Michiana Easy Livin' Country*, 168 S.W.3d at 791). When conducting a jurisdictional analysis, we must not "confuse 'the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits.'" *Id.* (quoting *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 70 (Tex. 2016)). The supreme court has expressly disapproved of opinions holding that "specific jurisdiction turns on whether a defendant's contacts were tortious rather than the contacts themselves." *Michiana Easy Livin' Country*, 168 S.W.3d at 791–92.

## B.  Quattro's and Liyeos's Special Appearance

Quattro and Liyeos both argue that the trial court erred in impliedly finding that they had purposeful contacts with Texas. They argue that a lease transaction for a retail store in Lubbock, Texas, should not be considered one of their contacts

because Mattress Firm entered into that lease with an affiliate of Quattro—not Quattro itself—and that Mattress Firm has neither pleaded nor proven any basis for imputing this contact of Quattro's affiliate to Quattro or Liyeos. They further argue that their remaining contacts with Texas are not purposeful, are not substantially connected to the operative facts of the litigation, and are not sufficient to support the exercise of personal jurisdiction over them.

## 1. Contacts with Texas

In support of Quattro's and his own special appearance, Liyeos averred that Quattro had not entered into any contracts in Texas and had not entered into any leases with Mattress Firm or a Mattress Firm affiliate in Texas. Liyeos acknowledged that, over a five-year period, Quattro-affiliated companies entered into twenty-one leases with Mattress Firm, and Quattro itself entered into a lease with Mattress Firm for a premises in Illinois, which it then assigned to an affiliated entity. Liyeos averred the following with respect to the Lubbock store and Quattro's communications with Mattress Firm:

> Only one of the 22 [Mattress Firm] leases pertains to a [Mattress Firm] store in Texas. Specifically, in July 2013, Quattro Springfield, LLC ("Quattro Springfield")—an Illinois limited liability company— entered into a ten-year lease with [Mattress Firm] covering property located in Lubbock, Texas. Quattro Springfield ceased being the landlord under the lease in June 2014, following the sale of the land upon which the Lubbock [Mattress Firm] store was located. Quattro did not pay any fees to Alexander Deitch or any entities owned or controlled by Deitch in connection with the Lubbock lease, and is not aware of any Quattro affiliate paying any such fees.

19

. . . .

Over the course of the leases between Quattro affiliates and [Mattress Firm], Quattro representatives met with [Mattress Firm] representatives in Texas on approximately three occasions to discuss, in general terms, [Mattress Firm's] national expansion efforts. Aside from those three occasions, Quattro representatives communicated with [Mattress Firm] representatives primarily by email or phone from outside of Texas. Neither Quattro nor I had any communications in Texas with [Mattress Firm] or any of the defendants in this lawsuit regarding any of the matters of which [Mattress Firm] complains in this lawsuit, including (i) equity participation by Deitch, any [Mattress Firm] employee, or any entity owned or controlled by Deitch or any [Mattress Firm] employee in any real estate development projects undertaken by Quattro or any of its affiliates, (ii) payment of development or brokerage fees to Deitch or entities owned or controlled by Deitch, or (iii) other payments or gifts to Deitch, any [Mattress Firm] employee, or any entity owned or controlled by Deitch or any [Mattress Firm] employee.

In its response to Quattro's and Liyeos's special appearances, Mattress Firm attached email correspondence involving Liyeos, Rob Walters (Quattro's other member), Levy, Vinson, and other Mattress Firm personnel. In June 2012, Walters emailed Levy to inform him that Quattro was purchasing a site in Lubbock and asking Levy if he would be interested in exploring the possibility of a Mattress Firm retail store at that location. Levy forwarded this email to Tim Hughes, a broker in Dallas, who began discussing the project with Walters. In September 2012, Walters informed Hughes that "[w]e are finally under contract and ready to see if there is a deal to be made with Mattress Firm." Walters proposed providing 4,500 square feet of space to Mattress Firm, and he told Hughes that "[t]he rent is going to need to be $34/sf with their build out"; and, while he acknowledged that this rental amount was

20

"probably high for Lubbock," he stated that it was for a prime location at a red light for an entrance to a shopping mall. Hughes and Levy then had an email conversation about this potential deal, with Hughes asking Levy, "[C]an you go to $34psf net in Lubbock?" Levy responded, "Yes. We like these guys[.]"

Mattress Firm's evidence also included email correspondence concerning a trip Liyeos and Walters took to West Texas in March 2013 to view potential locations in Amarillo, Lubbock, Midland, Odessa, San Angelo, and other towns. Vinson went on this tour with Liyeos and Walters, and Walters communicated with Levy concerning Vinson's thoughts about proposed locations in Lubbock. Later in March, Liyeos, Levy, Hughes, and Walters discussed scheduling the Lubbock location for a presentation before the Committee, and the documents attached to this email included site plans and a Letter of Intent with proposed lease conditions, including a ten-year lease term and base rent at $34 per square foot. The draft Letter of Intent was addressed to Liyeos at Quattro Development, LLC and listed the "Landlord Entity" as Quattro Lubbock, LLC." Liyeos and Quattro Development were listed as the "Landlord Contact."

Mattress Firm also attached PowerPoint presentations from two Committee meetings—one in April 2013 and one in May 2013—concerning two proposed retail stores located along the same street in Lubbock. The first store had a base rent of $12 per square foot, while the second store, developed by Quattro and presented at

21

the May 2013 meeting, had a base rent of $34 per square foot. In both instances, the Committee members signed a "Notice to Proceed."

Quattro Lubbock, LLC, a Quattro-affiliated company with Quattro as its sole manager, purchased the real property for the Lubbock store on June 5, 2013. On July 24, 2013, Mattress Firm and Quattro Springfield, L.L.C., a Quattro-affiliated company, entered into a lease agreement for the Lubbock property. On the same day, and at Quattro's request, Mattress Firm signed a guaranty agreement for the Lubbock property.[4] This guaranty named Quattro Springfield, L.L.C., as the landlord and provided that it was to be governed by the laws of the state of Texas. Although the lease agreement named Quattro Springfield as the landlord, it also provided that any notices required to be sent to the landlord under the lease should be sent to Liyeos at Quattro Development.

Mattress Firm also attached email correspondence between Liyeos and a Mattress Firm employee in which Liyeos planned to take a trip to Houston in September 2013 to meet Mattress Firm employees "with whom we've worked but have never actually met with in person." In November 2013, Quattro's Vice President of Development and Construction sent an email to Mattress Firm's Vice President of Construction proposing that they set up biweekly meetings "so we can

---

[4]    With respect to this guaranty, a Mattress Firm employee stated in an internal email, "This is our preferred developer so it is ok to give him [Walters] the guaranty for each of the three stores [including the Lubbock store] he is missing it from."

discuss our projects." In April and May 2014, Walters met with Levy, Vinson, and Deitch to tour potential locations in the Houston area, although, by July 2014, Quattro had been unable to complete a deal for any of the potential Houston-area locations, and there is no indication in the record that Quattro developed a property for Mattress Firm in Houston.

After Mattress Firm responded to the special appearances, Quattro filed an additional declaration from Liyeos. Liyeos disputed Mattress Firm's allegation that the base rent for the Lubbock store was "above market," stating that the rent was "competitive and consistent with the market rents for comparable properties at the time [Mattress Firm] and Quattro Springfield negotiated and entered into the lease." Liyeos also disputed the allegation that Quattro provided Mattress Firm with "misleading comps" and "inflated numbers" to justify the high rent for the Lubbock store. He declared that Quattro's request of a guaranty of the lease by Mattress Firm was a "normal business practice" for the company and was not an attempt by Quattro to raise the value of the property and increase its profit when the property was later sold.

Liyeos also asserted that Quattro paid no compensation to Deitch, Levy, Vinson, or any companies owned by these individuals in connection with the Lubbock store, that Deitch did not participate in negotiations concerning the Lubbock store, and that Quattro did not keep Hughes, Mattress Firm's local broker

for this location, "largely in the dark about the transaction" or conceal from Hughes Deitch's participation in the deal. With respect to the tour of potential Houston-area locations that occurred in May 2014, Liyeos denied that Quattro coordinated with Deitch "regarding 'how best to profit' from the Texas trip to [Mattress Firm's] detriment," nor did they have any discussions related to the matters that formed the basis of Mattress Firm's lawsuit.

## 2. Whether Quattro's and Liyeos's Contacts Were Purposeful

In asserting that they lack purposeful contacts with Texas, Quattro and Liyeos first argue that the Lubbock lease cannot constitute a purposeful contact with Texas that confers jurisdiction over them because a separate entity, Quattro Springfield, negotiated and entered into the lease with Mattress Firm. They argue that because Mattress Firm has neither alleged nor proven a jurisdictional veil-piercing theory, Quattro Springfield's contacts with Texas—the Lubbock lease—cannot be imputed to Quattro or Liyeos. We disagree.

Texas law presumes that two separate corporations are distinct entities. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007). Jurisdiction over one corporate entity, such as a parent corporation, does not automatically establish jurisdiction over a related corporate entity, such as a subsidiary. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 874 (Tex. 2010). "Instead, to 'fuse' two corporations for jurisdictional purposes, a parent must 'control[] the

24

internal business operations and affairs of the subsidiary' to an extent beyond its role as an investor." *Id.* (quoting *PHC-Minden*, 235 S.W.3d at 175); *BMC Software Belg.*, 83 S.W.3d at 799 (stating that parent company must exercise degree of control "greater than that normally associated with common ownership and directorship" and that evidence must show two entities ceased to be separate "so that the corporate fiction should be disregarded to prevent fraud or injustice"). The rationale behind exercising jurisdiction over the subsidiary corporation in such an instance is that "the parent exerts such domination and control over its subsidiary that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction." *BMC Software Belg.*, 83 S.W.3d at 798 (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983)). "The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation." *Id.*; *see PHC-Minden*, 235 S.W.3d at 173.

Quattro and Liyeos argue that Mattress Firm cannot rely on jurisdictional veil-piercing to impute Quattro Springfield's contacts with Texas to them because Mattress Firm did not plead a veil-piercing theory, such as alter ego, nor did it offer any evidence to support such a theory. They argue that Mattress Firm submitted no evidence concerning the relationship between Quattro and Quattro Springfield or the degree of control that one entity might exercise over the other. Mattress Firm,

25

however, argues that its failure to plead and prove a jurisdictional veil-piercing theory is not fatal to its attempt to use the Lubbock lease, entered into by Quattro Springfield, as a contact of Quattro's, citing as support the Texas Supreme Court's 2016 decision in *Cornerstone Healthcare Group Holding, Inc. v. Nautic Management VI, L.P. See* 493 S.W.3d 65 (Tex. 2016). We agree with Mattress Firm that *Cornerstone* is controlling in this case.

Cornerstone owned and operated long-term acute-care hospitals in Texas and other states, and, in a quest to expand its business, several of its executives identified Reliant Hospital Partners, LLC, which owned several rehabilitation facilities in Texas, as a possible acquisition. *Id.* at 67–68. The executives approached Nautic Partners, LLC, a Rhode Island company that investigates potential investments for private equity funds, as an investment source for the acquisition of Reliant. *Id.* at 68. One Cornerstone executive proposed to Nautic Partners that three equity funds advised by Nautic Partners acquire the assets of Reliant and hire Cornerstone executives to run the company. *Id.* Nautic Partners and Reliant signed a letter of intent concerning the asset purchase, and the equity funds authorized the investment in Reliant and issued a capital call. *Id.* at 68–69.

Through a series of four newly created subsidiary companies, a company known as New Reliant signed an asset purchase agreement with Reliant, and the funds raised during the equity funds' capital calls provided the purchase money for

26

the transaction. *Id.* at 69. After New Reliant acquired Reliant, the Cornerstone executives involved in proposing the deal quit Cornerstone and started working for New Reliant. *Id.* Cornerstone sued its former executives, New Reliant, Nautic Partners, Reliant, the equity funds, and other parties. *Id.* The equity funds and the entity that was their partner and manager—and that had authorized the investment in Reliant—all filed special appearances, arguing that they were Delaware limited partnerships with their principal places of business in Rhode Island and were therefore not subject to jurisdiction in Texas. *Id.*

The equity funds argued that they lacked minimum contacts with Texas, pointing out that New Reliant purchased and owned the hospitals located in Texas, not the funds themselves, and that New Reliant's contacts with Texas could not be imputed to the funds under a jurisdictional veil-piercing theory. *Id.* at 71. In addressing whether the equity funds had sufficient contacts with Texas, the Texas Supreme Court reasserted the general law stated in *PHC-Minden* that if a parent and subsidiary company maintain separate corporate entities, one entity's contacts in a forum state may not be attributed to the other. *Id.* at 72. The court stated:

> [The equity funds] are also correct that Cornerstone has not argued that the Funds and their subsidiaries failed to maintain their legal separateness or that the Texas contacts of any one of those entities could or should be attributed to any other. Accordingly, New Reliant's Texas contacts—specifically, its ownership and operation of hospitals in Texas—could not in and of themselves subject New Reliant's limited-partner parent companies and their general partner [the equity funds] to Texas's jurisdiction.

27

*Id.* However, the court then disagreed with the equity funds that their "use of a subsidiary to purchase the hospitals effectively ends the inquiry." *Id.*

The supreme court noted that the chain of events beginning with the initial presentation of the investment opportunity to the manager of the equity funds and ending with New Reliant's acquisition of the Texas hospitals "were all part of one overarching transaction." *Id.* The company agreement between the equity funds and the first subsidiary in the chain required the funds' capital calls to be used for New Reliant's purchase of the hospitals. *Id.* The equity funds directly transferred the purchase money to the law firm that served as New Reliant's disbursement agent, which transferred the purchase money to Reliant. *Id.* Additionally, all of the subsidiary companies involved in the transaction "were newly created to complete the transaction that the [equity funds] set in motion." *Id.* The court, in concluding that the purchase of the Texas hospitals was a contact of the equity funds and not solely that of New Reliant, stated:

> Cornerstone is not attempting to attribute the contacts established by New Reliant as a going concern to the Funds or the General Partner. Rather, it is seeking to trace the purchase of Texas assets to the entities that spearheaded and directed the transaction, and ultimately stood to profit from it. We agree with Cornerstone that "[k]eeping legal entities distinct does not mean they can escape jurisdiction by splitting an integrated transaction into little bits." Although "only the defendant's contacts with the forum" count, not "the unilateral activity of another party or a third person," the Reliant deal did not stem from a third party's unilateral activity; it was the result of a transaction stemming from the activity of the [equity funds] themselves.

28

*Id.* at 72–73 (internal citations omitted).

This case is sufficiently analogous to *Cornerstone* such that the Lubbock lease executed by Quattro Springfield is a contact of Quattro's, just as New Reliant's purchase of the Texas hospitals was a contact of the equity funds. Mattress Firm presented evidence that Rob Walters, a member of Quattro, informed Levy via email in June 2012 that Quattro intended to purchase a location in Lubbock and asked if Levy would be interested in locating a retail store at this location. Walters sent this email from his Quattro Development email address, and the email's signature block stated, "Quattro Development, L.L.C."[5] As an attachment to this email, Walters included two pages that showed a map of the location, information on the area's demographics, and a diagram of the building and parking lots. Both of these pages included a logo that stated "Quattro Development" and included contact information for "Quattro Development Construction Contact" and "Quattro Development Leasing Contact." Throughout the negotiation process for the purchase and leasing of the Lubbock location, all of the email correspondence from Walters and Liyeos were sent from their Quattro Development email addresses. A site plan for the Lubbock location included a reference to "Quattro Development, LLC."

---

[5] This email stated, "**Lubbock, TX** — We are buying the Cancun Restaurant which is at a stoplight at the northern entrance to the mall."

29

An unexecuted "Letter of Intent to Lease Space" on Mattress Firm letterhead, dated March 28, 2013, concerned the property and was addressed to Liyeos at "Quattro Development, L.L.C." One part of the Letter of Intent listed "Quattro Lubbock, L.L.C." as the "Landlord Entity." However, the Letter of Intent listed Liyeos at "Quattro Development, L.L.C." as the "Landlord Contact," and the signature block, which was left blank, stated, "LANDLORD: QUATTRO DEVELOPMENT, L.L.C." The Letter of Intent did not mention Quattro Springfield. The record contains a general warranty deed for the Lubbock property, reflecting that on June 5, 2013, the property was conveyed to "Quattro Lubbock, LLC."

The only two documents in the record that connect Quattro Springfield to the transaction involving the Lubbock property are the lease agreement and the guaranty, both of which were executed on July 24, 2013, and identify Quattro Springfield as the landlord of the property. The lease, however, also includes a section detailing where parties are to send notices required under the lease. This provision states, "**To Landlord:** Quattro Development, L.L.C." and "Attention: Mike Liyeos."

Quattro attempts to distinguish *Cornerstone* by pointing out that, unlike the subsidiary entities created by the equity funds after their investment in Reliant had been authorized, Quattro Springfield had been in existence for at least a year before execution of the Lubbock lease and therefore Quattro did not create Quattro

30

Springfield solely "as a 'vehicle' for leasing premises to [Mattress Firm] in Texas." *See Cornerstone*, 493 S.W.3d at 72. Quattro also argues that, unlike in *Cornerstone*, the record here does not contain evidence concerning the source of the funds used to acquire the property that Quattro Springfield leased to Mattress Firm. *See id.* These differences between *Cornerstone* and this case, however, do not compel a conclusion that the Lubbock lease is solely a contact of Quattro Springfield and not of Quattro.

The record before the trial court does not support Quattro's contention that Quattro Springfield was the entity that negotiated the transaction for the Lubbock lease. Instead, the record reflects that Quattro itself initiated the deal and was heavily involved in bringing the transaction to fruition. As in *Cornerstone*, by arguing that the Lubbock lease is a contact of Quattro's, Mattress Firm "is seeking to trace the purchase of Texas assets to the entit[y] that spearheaded and directed the transaction, and ultimately stood to profit from it." *See id.* at 73. The negotiation and execution of the Lubbock lease was an "integrated transaction," and Quattro cannot "escape jurisdiction" by using separate entities to "split[] an integrated transaction into little bits." *See id.* Purchasing the real property in Lubbock and negotiating the lease of the property to Mattress Firm "did not stem from a third party's unilateral activity"; instead, this "was the result of a transaction stemming from the activity" of Quattro itself. *See id.* We therefore conclude that the Lubbock lease is a contact of Quattro's,

31

and we now turn to whether that contact constitutes purposeful availment of the laws of Texas.

In *Retamco Operating, Inc. v. Republic Drilling Co.*, the Texas Supreme Court held that a California company, Republic, that took assignment of oil and gas interests located in Texas had purposeful contacts with Texas that were not "random, fortuitous, or attenuated." 278 S.W.3d at 339. Republic was aware that the interests it received were located in three Texas counties and it "purposefully took assignment of Texas real property." *Id.* By taking assignment of these property interests located in Texas, Republic "reached out and created a continuing relationship in Texas," and the ownership of the property interests allowed Republic to enjoy the benefits and protections of Texas laws. *Id.* (quoting *Michiana Easy Livin' Country*, 168 S.W.3d at 787). The court held that Republic's Texas contacts were not the result of unilateral actions of a third party; instead, "Republic was a willing participant in a transaction with an affiliated Texas company to purchase Texas real property." *Id.* at 340. The assignment of the oil and gas interests "gave Republic valuable assets in Texas," and Republic had benefitted from the assignment, as it had made over $1 million in revenue and had sold some of the property. *Id.* The court thus concluded that Republic, by purchasing real property interests located in Texas, had "purposefully availed itself of the privilege of conducting activities in Texas." *Id.*

Here, Quattro informed Levy of its intent to purchase a site in Lubbock, Texas, and proposed that Mattress Firm use that location for a retail store. After months of negotiations, a Quattro affiliate—Quattro Lubbock—purchased the real property and a second Quattro affiliate—Quattro Springfield—executed a lease with Mattress Firm. Quattro initiated and was directly involved in this transaction. This transaction was the result of Quattro's actions, not the unilateral actions of a third party. *See Bell*, 549 S.W.3d at 559. With the Lubbock lease, Quattro specifically sought out a Texas property as an investment opportunity and presented this property to Mattress Firm as a potential transaction, which was later finalized. This contact was purposeful and was not random or fortuitous. *See Cornerstone*, 493 S.W.3d at 73 ("[T]he Funds, through the General Partner, targeted Texas assets in which to invest and sought to profit from that investment."); *Retamco Operating*, 278 S.W.3d at 339–40 (stating that "the location of the transferred asset is not fortuitous; the property's location is fixed in this state" and that "when purchasing real property, the location matters"). Finally, owning and leasing real property in Texas through its affiliates gave Quattro a valuable asset located in Texas and allowed Quattro to "enjoy the benefits and protection" of Texas laws. *See Retamco Operating*, 278 S.W.3d at 339. Moreover, the lease agreement between Quattro Springfield and Mattress Firm for the Lubbock property provided that it was to be governed by the laws of the State of Texas.

33

We conclude that, by proposing, negotiating, and executing the Lubbock lease, and by agreeing that it was to be governed by the laws of Texas, Quattro "purposefully directed its activities towards Texas" and "has purposefully availed itself of the privilege of conducting activities in Texas." *See id.* at 340; *see also Cornerstone*, 493 S.W.3d at 73 (stating that equity funds "specifically sought both a Texas seller and Texas assets" and concluding that funds had purposeful contacts with Texas and sought "some benefit, advantage, or profit" from Texas "such that they impliedly consented to suit here").

Exercising specific jurisdiction requires more than just purposeful contacts with Texas, however; for the nonresident defendant to be subject to suit here, the defendant's purposeful contacts "must be substantially connected to the operative facts of the litigation or form the basis of the cause of action." *Bell*, 549 S.W.3d at 559–60. Here, Mattress Firm asserted causes of action for fraud, civil conspiracy, and aiding and abetting breach of fiduciary duty against Quattro; it also alleged that Quattro had been unjustly enriched, and it sought the imposition of a constructive trust. All of Mattress Firm's causes of action are based on its allegations that Quattro, along with multiple other real estate development companies, engaged in a wide-ranging fraudulent scheme involving the payment of bribes and kickbacks to Mattress Firm personnel and brokers—Levy, Vinson, Deitch, and Colliers Atlanta—in a conspiracy to defraud Mattress Firm. Mattress Firm alleged that development

34

companies such as Quattro paid bribes and kickbacks to help secure favorable lease terms in an effort to increase the value of the properties to maximize the profit on the later sale of the properties. Mattress Firm also alleged that the development companies worked behind-the-scenes with Levy, Vinson, and Deitch to ensure favorable lease terms, such as inflated rental rates, which Levy, Vinson, and Deitch would then present to the Committee as favorable deals for Mattress Firm, using misrepresentations and omissions to ensure approval of the deals by the Committee.

Resolution of these claims will involve examining the circumstances surrounding the transactions that were a part of the purportedly fraudulent bribery and kickback scheme. The process by which the Lubbock lease—among many others—was negotiated and executed will be an operative fact in the litigation of Mattress Firm's claims. We conclude that Mattress Firm's claims have a substantial connection with Quattro's purposeful contacts with Texas and that the claims arise out of and relate to Quattro's contacts. *See id.*; *Cornerstone*, 493 S.W.3d at 74 (holding that claims concerning improper use of confidential information, tortious interference, and aiding and abetting breach of duties arose out of Reliant transaction, which was "the crux of the [equity funds'] purposeful contact with Texas" and would be focus of claims against equity funds at trial).

Quattro argues that there is no substantial connection between the Lubbock lease and the operative facts of Mattress Firm's claims because Quattro presented

evidence, in the form of Liyeos's affidavit, that Quattro paid no fees—proper or improper—to Deitch, entities owned by Deitch, or Mattress Firm "insiders" such as Levy and Vinson with respect to the Lubbock lease. Essentially, Quattro argues that it is not subject to specific jurisdiction in Texas because its conduct in Texas concerning the Lubbock lease was not tortious.

The Texas Supreme Court has, however, repeatedly held that whether the defendant's conduct is tortious is not relevant to the minimum-contacts analysis that is to be performed at the special appearance stage of litigation. *See Bell*, 549 S.W.3d at 562 (stating that "we may not determine the underlying merits in order to answer the jurisdictional question" and that, whether transfers of money at issue in case were innocent loans or part of elaborate conspiracy to defraud creditors, focus of special appearance inquiry was defendant's contacts with Texas); *Searcy*, 496 S.W.3d at 70 ("We must not confuse 'the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits.'") (quoting *Michiana Easy Livin' Country*, 168 S.W.3d at 790); *Cornerstone*, 493 S.W.3d at 73 ("[W]hether the [equity funds'] conduct was ultimately tortious is not before us and is not relevant to the minimum-contacts analysis."); *Michiana Easy Livin' Country*, 168 S.W.3d at 791 ("Jurisdiction cannot turn on whether a defendant denies wrongdoing—as virtually all will. Nor can it turn on whether a plaintiff merely alleges wrongdoing—again as virtually all will.").

The trial court had pleadings and evidence before it that Quattro purposefully purchased property in Texas and executed a lease on the property with Mattress Firm. Mattress Firm alleges improprieties in this transaction, which was allegedly part of a broader fraudulent scheme. Regardless of whether Quattro's conduct with respect to the Lubbock lease was innocent or was fraudulent, this contact with Texas was purposeful and is substantially connected to the operative facts of Mattress Firm's claims. *See Michiana Easy Livin' Country*, 168 S.W.3d at 790–91 (stating that "[i]f purposeful availment depends on whether a tort was directed toward Texas, then a nonresident may defeat jurisdiction by proving there was no tort" and that it is better for judges to "limit their jurisdictional decisions" to business contacts of defendants, which are "generally a matter of physical fact," without "involving themselves in trying" tort liability, which "turns on what the parties thought, said, or intended").

Liyeos, individually, argues that the trial court erred in denying his special appearance because Mattress Firm failed to plead any facts showing that he committed a tort in Texas or any facts that would bring him within the scope of Texas's long-arm statute, nor did the language of Mattress Firm's petition assert any tort claims against Liyeos. Liyeos further argues that he does not have sufficient minimum contacts with Texas and, to the extent he does have any contacts with

37

Texas, there is no substantial connection between his contacts and Mattress Firm's causes of action.

We do not agree with Liyeos's contention that Mattress Firm did not allege facts bringing him within the scope of the Texas long-arm statute. Mattress Firm alleged that Liyeos was one of two members of Quattro and that he regularly communicated with Levy, Vinson, and other Mattress Firm employees by email and phone. It alleged that Quattro "and Liyeos, one of two sole members of Quattro, were participants in the massive, multi-year fraud, bribery, and kickback scheme that is the subject of this lawsuit." Mattress Firm alleged that Liyeos and Walters arranged a tour of West Texas locations in March 2013 and a trip to Mattress Firm's Houston headquarters in November 2013. It alleged that, on the draft Letter of Intent for the Lubbock lease, Liyeos was listed as the landlord contact and that Liyeos "emailed Levy about pushing the Lubbock deal" to the Committee. Mattress Firm alleged that Quattro and Liyeos conducted the negotiations for the Lubbock lease, and the lease agreement for the Lubbock property listed Liyeos as the contact for all notices to be sent to the landlord. With respect to its civil conspiracy cause of action, asserted against "All Defendants," Mattress Firm alleged:

> Defendants, Levy, Terra Consulting, Deitch, Colliers Atlanta, Chase Ventures, Vinson, Oldacre McDonald, Win-Development, Quattro, and Madison Development, and others acting in concert with or on behalf of the foregoing, knowingly, willfully, and unlawfully did conspire, combine, confederate, and agree together to defraud Mattress Firm.

38

Mattress Firm also sought the imposition of a constructive trust against "All Defendants," and it requested the disgorgement of ill-gotten gains from "All Defendants" based on an unjust enrichment theory.[6]

Most of Mattress Firm's allegations mention only Quattro, which, as an entity, can act only through its members: Liyeos and Walters. However, Mattress Firm's live pleading does contain allegations concerning specific actions that Liyeos took with respect to negotiating the Lubbock lease, and the evidence that Mattress Firm attached to its response to Quattro's and Liyeos's special appearance also reflects that Liyeos played a significant role in completing that transaction. Mattress Firm's live pleading, although not a model of clarity with respect to which claims are being asserted against which defendants, also asserts causes of action against Liyeos and seeks relief against him.

All of Liyeos's contacts with Texas are a result of his position as one of Quattro's members. We have already held that the Lubbock lease constitutes a purposeful contact of Quattro's and that there is a substantial connection between this contact and the operative facts of Mattress Firm's causes of action. The jurisdictional allegations and evidence reflect Liyeos's significant involvement in

---

[6]     Mattress Firm also stated that its fraud cause of action was asserted against "All Defendants," but the subsequent allegations concerning this cause of action solely addressed misrepresentations and omissions made to Mattress Firm by Levy, Vinson, Deitch, and Colliers Atlanta. None of the other defendants are mentioned in the specific allegations for the fraud cause of action.

the Lubbock transaction. To the extent Liyeos argues that the Lubbock lease should not be considered his contact, individually, because all of his actions with respect to this transaction occurred as an officer of Quattro and were taken on Quattro's behalf, we note that Texas courts have held that the "fiduciary shield doctrine," while applicable to protect a corporate officer "in some circumstances from being subject to jurisdiction on a general jurisdiction theory, . . . does not protect a corporate officer from specific personal jurisdiction as to intentional torts or fraudulent acts for which he may be held individually liable." *See, e.g.*, *Nw. Cattle Feeders, LLC v. O'Connell*, 554 S.W.3d 711, 725 (Tex. App.—Fort Worth 2018, pet. denied); *Ennis v. Loiseau*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005, no pet.) ("Courts recognize that a corporate officer is not protected from the exercise of specific jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct, directed at the forum state, for which he may be held personally liable."); *see also Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 201 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) ("A corporate officer who knowingly participates in tortious or fraudulent acts may be held individually liable to third persons even though he performed the act as an agent of the corporation."). Status as a corporate employee "does not somehow insulate [the officer] from jurisdiction," and an officer "may not escape liability where he had direct, personal participation in the wrongdoing, as to

be the 'guiding spirit behind the wrongful conduct' or the 'central figure in the challenged corporate activity.'" *See Ennis*, 164 S.W.3d at 707–08 (quoting *Calder v. Jones*, 465 U.S. 783, 790 (1984), and *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985)).

We therefore conclude that the Lubbock lease is also a purposeful contact of Liyeos's, sufficient to subject him to the exercise of specific jurisdiction in Texas.

### 3. Traditional Notions of Fair Play and Substantial Justice

As we have determined that Quattro and Liyeos have sufficient minimum contacts with Texas to support specific jurisdiction, we now must decide whether exercising that jurisdiction comports with traditional notions of fair play and substantial justice. *See Bell*, 549 S.W.3d at 559. In making this determination we consider the following factors, when appropriate:

> (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies.

*Cornerstone*, 493 S.W.3d at 74; *Moncrief Oil Int'l*, 414 S.W.3d at 155. "If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice." *Moncrief Oil Int'l*, 414 S.W.3d at 154–55. The defendant bears the burden of presenting a compelling case that the presence of some

consideration would render the exercise of jurisdiction over it unreasonable. *Hoagland v. Butcher*, 474 S.W.3d 802, 816 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Quattro and Liyeos have not presented a compelling case that exercising personal jurisdiction over them would be unreasonable or would violate traditional notions of fair play and substantial justice. Indeed, Quattro and Liyeos did not argue this basis for defeating personal jurisdiction either in its special appearance in the trial court or in its briefing on appeal. *See Kelly*, 301 S.W.3d at 659 (stating that defendant can negate jurisdiction on legal basis, such as demonstrating that exercise of jurisdiction offends traditional notions of fair play and substantial justice). We conclude that because Quattro and Liyeos have minimum contacts with Texas sufficient to support specific jurisdiction and they have not demonstrated or argued that exercising jurisdiction would offend traditional notions of fair play and substantial justice, exercising specific jurisdiction over Quattro and Liyeos in this case comports with state and federal due process guarantees. *See Bell*, 549 S.W.3d at 559. We hold that the trial court did not err by denying Quattro's and Liyeos's special appearances.

## C. Madison's Special Appearance

Madison argues that the trial court erred by impliedly finding that it had sufficient minimum contacts with Texas to support specific jurisdiction.

42

Specifically, it argues that its limited contacts with Texas did not constitute purposeful availment and were not substantially connected to the operative facts of Mattress Firm's claims against it. Madison also argues that exercising specific jurisdiction over it would offend traditional notions of fair play and substantial justice.

## 1. Contacts with Texas

The focus of Madison's argument that it lacks sufficient minimum contacts with Texas is a meeting that occurred in May 2012 before the Committee—Mattress Firm's real estate committee responsible for deciding which leases for new retail stores to approve—in Houston. In its live pleading, Mattress Firm alleged:

> [Madison] secured its position as a Preferred Developer, and some of its earliest deals, at a meeting at Mattress Firm's headquarters in Houston, Texas. In May of 2012, when Madison Development was first establishing its relationship with Mattress Firm, Jim Gallaugher, co-founder of Madison Development, traveled to Houston to participate in a [Committee] meeting to pitch how Madison Development could assist Mattress Firm in its efforts to expand in the Washington market. Although Gallaugher may not have actually made the presentation to the [Committee], he helped Jim Quigley, the presenter, come up with the market strategy for Washington to be presented to the [Committee].

> During the presentation, two Washington properties were discussed on which Madison Development ultimately closed with Mattress Firm . . . . Quigley, who made the presentation to the [Committee], was Mattress Firm's local broker on both of these deals. Together, Gallaugher and Quigley pitched these deals to the [Committee] in Houston, Texas, as well as Madison Development's efforts to expand Mattress Firm's presence in Washington state.

> During the meeting, Gallaugher provided Mattress Firm with information about the rental rates in these areas. After the meeting,

43

> Gallaugher treated Levy and John Broses [a Mattress Firm employee] to dinner, where he continued to pitch [the properties] as great deals. Mattress Firm ultimately entered into leases on [the properties], but neither were great deals for Mattress Firm as falsely represented by Gallaugher in Houston, Texas. Instead, the leases contained above-market rents which had the effect of increasing Madison Development's profits on the deals at Mattress Firm's expense.

Mattress Firm alleged that Levy then "fast tracked" the two Spokane leases through the Committee approval process and that the Committee ultimately approved the leases. Mattress Firm further alleged that Madison purchased the properties through two affiliated companies and, through these affiliates, later sold the properties within one year and made a substantial profit, in excess of $2 million per property.

In its special appearance, Madison acknowledged that, from 2011 through 2017, it developed twenty-nine stores for Mattress Firm in several states, although none of those developments were located in Texas.[7] In a declaration in support of Madison's special appearance, Madison's principal, Gallaugher, declared that "[n]one of the negotiations for the [Mattress Firm] stores Madison developed were conducted in Texas." Madison also acknowledged that the May 2012 Committee meeting occurred and that Gallaugher was in attendance at this meeting. With respect to this meeting, Gallaugher declared as follows:

---

[7] In a response to Mattress Firm's requests for production, Madison stipulated that Madison's employees had regular email and phone communications with Mattress Firm's employees and that "[t]here were a handful of email communications regarding two potential Texas locations but those potential Texas projects did not go forward."

44

In or around May 2012, I observed a presentation in Texas before [the Committee] concerning the Spokane, Washington, real estate market. Madison did not prepare for or present this presentation to [Mattress Firm]. The presentation was prepared and presented by Jim Quigley, a local Washington broker hired by [Mattress Firm]. After the presentation, I was asked one single question regarding why the rents at the two locations were the same, to which I answered that the two locations' development costs were essentially the same. I observed [Steve] Stagner[8] [Mattress Firm's former President and CEO] ask Vinson why the projected sales numbers for the Spokane properties seemed low, to which Vinson replied that he was being conservative with his projections. Stagner advised Vinson to increase the projections.

Madison later filed a further declaration from Gallaugher in which he expanded on the May 2012 meeting. Gallaugher again declared that the presentation was prepared and conducted by Quigley, a local broker hired by Mattress Firm who was "very knowledgeable about the Spokane real estate market." Gallaugher declared that Levy developed the strategy for Mattress Firm's entry into the Spokane real estate market "after he visited and inspected a number of potential sites in Spokane for new [Mattress Firm] stores." Gallaugher declared that neither he nor any other Madison employee assisted Quigley in preparing the materials for the presentation to the Committee, nor did Gallaugher "pitch" Madison or the two Spokane properties at the Committee meeting or offer an opinion concerning the potential profitability of the properties. He reiterated that, at this meeting, he "was asked a single question after the presentation concluded about why the Properties

8      Steve Stagner is not a party to the underlying lawsuit.

45

had the same rent," and he responded that the development costs for the projects were the same. He declared that he was never asked about comparable rental rates in the Spokane market.

Gallaugher further declared that, after the meeting, he went to dinner with Quigley, a Mattress Firm employee, and one of Mattress Firm's "Master Brokers." He characterized this as a "business entertainment dinner" and stated that it was "[s]omething [he] would have done when taking any other of Madison's clients out to dinner under similar circumstances." Gallaugher declared that, in August 2012, he learned that the Committee had approved the two leases in Spokane, but he was not present for that meeting, he did not request that the leases be "fast tracked" for approval, and he did not know what the "fast tracking" process entailed. Gallaugher also disputed Mattress Firm's allegations that Madison, after selling the two Spokane properties, made a profit of over $2 million dollars on each property, stating that Mattress Firm had failed to take into consideration development costs for the properties. He declared that, after those costs were taken into account, Madison's profit for both of the sales was approximately $370,000.

In response to Madison's special appearance, Mattress Firm did not present a competing affidavit addressing what occurred at the May 2012 Committee meeting.

Instead, Mattress Firm submitted documentary evidence,[9] including email correspondence involving Gallaugher, Levy, Vinson, and others. In one email, addressed November 23, 2011, six months before the Committee meeting at issue, Gallaugher emailed a person named Jeffrey Rosen about Mattress Firm. Gallaugher stated, "I am helping Mattress Firm's expansion in several northwest markets including Spokane. Jim Quigley of KHCO and I have been coming up with a market strategy for eastern Washington when we discovered that you . . . were also representing them." Gallaugher's email to Rosen referenced both Vinson, whom Gallaugher characterized as a "rogue franchisee," and Levy. Rosen forwarded this email to Vinson, who then forwarded it to Levy. Levy responded to Vinson that Rosen "was hired not by me, but you" and that for Mattress Firm business, Rosen was "not entitled to commissions against my guys [sic] work." Levy sent the entire chain of emails back to Gallaugher on November 24, 2011.

Madison also acknowledged that Gallaugher traveled to Texas on three other occasions in 2015. Mattress Firm was a corporate sponsor of the Houston Livestock Show & Rodeo in 2015, and Gallaugher declared that he attended the event at the

---

[9] Mattress Firm's evidence also included draft Letters of Intent concerning the properties; the PowerPoint presentation slides from the May 2012 Committee meeting; internal Mattress Firm documents indicating that the leases were "fast tracked" and approved in August 2012; and the leases themselves, executed by Gallaugher on behalf of the Madison-affiliated entities in September 2012. Both leases included provisions stating that the lease provisions would be construed in accordance with the laws of Washington.

request of Mattress Firm. He declared that neither Madison nor he contributed financially to the event, that the trip "was a purely social event," and that he did not discuss or conduct business with Mattress Firm. In August 2015, Mattress Firm requested that Gallaugher attend a meeting in Texas "to discuss layout and design at one of [Mattress Firm's] potential warehouse sites in Colorado." Vinson, along with other Mattress Firm personnel, attended, and he "presided over the meeting and asked Madison, as the potential fee developer, questions about the project." Finally, Madison and E. Smith Realty Partners, a brokerage firm founded by former Dallas Cowboys player Emmitt Smith and a business partner of Mattress Firm's, co-hosted and split the cost of a "business entertainment [event] of a social nature" at a Cowboys game in November 2015. Gallaugher and his family attended, as did Levy, Vinson, Stagner, and their families, among others. Gallaugher declared that "no business was conducted or discussed" at this event.

## 2. Whether Madison's Contacts Were Purposeful

It is undisputed that Gallaugher, Madison's principal, traveled to Texas on several occasions related to Madison's ongoing business relationship with Mattress Firm, including the May 2012 Committee meeting. It is also undisputed that, at this meeting, Quigley gave a PowerPoint presentation recommending that Mattress Firm enter into leases for retail stores on two properties in Spokane, Washington, to be developed by Madison. It is undisputed that, at a later meeting, the Committee

48

approved these leases and that Mattress Firm and two affiliated companies of Madison later executed leases for these properties. The two Madison-affiliated companies that owned the real property later sold the properties and made a profit on the sales transactions.

Madison argues that Gallaugher's attendance at the Committee meeting does not constitute a purposeful contact with Texas because Mattress Firm has not alleged that any wrongful act occurred at that meeting and because Madison did not commit a tort at that meeting. It points to Gallaugher's declarations, in which he declares that Quigley made the presentation before the Committee, he did not assist Quigley in preparing the presentation, he did not "pitch" the properties at the meeting, he only answered one question at the meeting—after Quigley's presentation—concerning why the rental rates for the two properties were the same, and he made no statements concerning comparable rental rates or other information relevant to the Spokane market. Madison argues that the record contains no evidence that it "conducted 'business with a Texas resident' or made a statement amounting to a misrepresentation sufficient to confer jurisdiction."

We find Madison's arguments unavailing. Madison admits that it had an ongoing business relationship with Mattress Firm, a Texas resident. Over a period of six years, Madison developed twenty-nine properties for Mattress Firm retail stores, albeit none of them located in Texas. Each lease for a retail store had to be

approved by Mattress Firm's Committee, which met in Houston. Madison sought to develop two retail stores for Mattress Firm in Spokane, Washington, and these locations were put on the agenda to be discussed at a Committee meeting in Houston in May 2012. Although Quigley, a local Washington real estate broker, made the actual presentation to the Committee, Mattress Firm presented evidence, in the form of an email from Gallaugher to Jeffrey Rosen in November 2011, that Gallaugher was "helping Mattress Firm's expansion in several northwest markets including Spokane" and was working with Quigley on "coming up with a market strategy for eastern Washington." There is evidence, therefore, that Madison was not simply a passive observer at the meeting in Texas, but that it had been involved with developing the proposal for the two Spokane properties—as well as a larger strategy for Mattress Firm in Washington. One of the purposes of the Committee meeting was to propose the Spokane properties as opportunities for new Mattress Firm retail stores developed by Madison and to obtain approval from the Committee concerning those leases. Gallaugher, after having worked with Quigley and Mattress Firm personnel such as Levy, attended the meeting as Madison's representative and answered a question about the proposal after Quigley's presentation concluded.

In addition to attending the May 2012 Committee meeting, Madison acknowledged that it regularly communicated by email and phone with Mattress Firm personnel. It also acknowledged that Gallaugher traveled to Texas on three

50

other occasions: once to meet with Vinson and other Mattress Firm personnel concerning the design of a potential Mattress Firm warehouse located in Colorado; once to attend the Houston Livestock Show & Rodeo as a guest of Mattress Firm personnel; and once to co-sponsor and attend a Dallas Cowboys game, at which several high-ranking Mattress Firm employees were present with their families. The pleadings and the evidence thus demonstrate that Madison had an ongoing relationship with Mattress Firm that lasted years, that Madison conducted business in Texas by attending a meeting to seek approval of the development of two retail stores, and that Madison personnel traveled to Texas to further their relationship with Mattress Firm personnel via social events. We conclude that this conduct constitutes purposeful contacts with the state of Texas.

The Texas Supreme Court has held that although a single business transaction that occurs outside of Texas is insufficient to confer specific jurisdiction, activity that is "aimed at getting extensive business in or from" Texas constitutes purposeful and substantial contacts. *Moncrief Oil Int'l*, 414 S.W.3d at 153; *Michiana Easy Livin' Country*, 168 S.W.3d at 787–90. Defendants who agree to attend business meetings in Texas at which conduct related to the operative facts of the plaintiff's claims occur have a "say in the matter" and are not "unilaterally haled into forming contacts with Texas." *Moncrief Oil Int'l*, 414 S.W.3d at 153.

Here, Madison did not engage solely in a single out-of-state transaction with a Texas resident. Instead, it entered into a years-long relationship with Mattress Firm; both parties sought to cultivate and continue this relationship; and it traveled to Texas to attend a meeting concerning two potential new developments for Mattress Firm, both of which were later approved and ultimately secured Madison a financial benefit when it sold the properties. Madison's contacts with Texas were purposeful; they were not the unilateral result of conduct by third parties; and Madison sought a benefit, advantage, or profit by creating and sustaining a relationship with Mattress Firm, a Texas resident. *See id.* at 154 (noting that supreme court had previously found jurisdiction over nonresident with no physical ties to Texas when out-of-state transaction "was actively and successfully solicited in Texas"); *Michiana Easy Livin' Country*, 168 S.W.3d at 785 ("Sellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the jurisdiction of the latter in suits based on their activities.") (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)).

We now turn to whether Madison's purposeful contacts with Texas are substantially connected to the operative facts of the litigation. *See Bell*, 549 S.W.3d at 559–60. Mattress Firm asserted the same causes of action against Madison that it did against Quattro and Liyeos: fraud, civil conspiracy, aiding and abetting breach of fiduciary duty, unjust enrichment, and imposition of a constructive trust. As we

52

discussed above with respect to Quattro and Liyeos, all of Mattress Firm's causes of action are based on its allegations that Madison, as a real estate development company, was involved in a scheme to defraud Mattress Firm by, among other things, paying bribes and kickbacks to Mattress Firm insiders and one of its brokers and working with Mattress Firm insiders to agree on above-market rental rates and longer-than-average lease terms—conditions that were unfavorable to Mattress Firm as a tenant but that would make the properties more valuable and would yield a greater profit for Madison when it sold the properties shortly after executing the lease with Mattress Firm—that the insiders would then present to the Committee as favorable deals to ensure the Committee's approval of the leases.

Mattress Firm alleges that the transactions involving the two Spokane properties developed by Madison were two of the lease agreements purportedly secured by making misrepresentations and omissions to the Committee. Resolution of Mattress Firm's claims against Madison will involve, among other evidence, consideration of the circumstances surrounding the execution of the Spokane leases, including conduct related to developing the market strategy for the Spokane leases and conduct that occurred at the May 2012 Committee meeting attended by Gallaugher on behalf of Madison. Mattress Firm also alleges that, in exchange for "lucrative deals," Madison offered "items of significant value" to Levy, Vinson, and Deitch, and it identified one instance that occurred in Texas: Madison allegedly

"rewarding" Levy, Vinson, and Deitch for their part in the scheme by co-sponsoring a suite at a Dallas Cowboys game. We conclude, as we did with respect to Quattro and Liyeos, that Madison's purposeful contacts with Texas are substantially connected to the operative facts of the litigation, such that Mattress Firm's claims against Madison arise out of and relate to Madison's Texas contacts.[10] *See Bell*, 549 S.W.3d at 559–60.

### 3. Traditional Notions of Fair Play and Substantial Justice

Madison argues that the burden placed on it if it were forced to continuing defending itself in Texas would be great because it "is a small business with only two employees" and a lawsuit in Texas "would greatly interfere with [Madison's] operations and its employees' responsibilities." Although it would be a burden on Madison for its representatives—presumably Gallaugher—to travel to Texas to participate in litigation, "the same can be said of all nonresidents" and "[d]istance alone cannot ordinarily defeat jurisdiction." *Moncrief Oil Int'l*, 414 S.W.3d at 155; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991) (noting that "modern transportation and communication have

---

[10]    Madison, like Quattro, argues that there is no substantial connection between its Texas contacts and the operative facts of the litigation in part because Madison did not engage in any wrongful conduct at the May 2012 Committee meeting. As we concluded with respect to Quattro, whether Madison's conduct concerning the May 2012 Committee meeting in particular and the Spokane leases in general is ultimately tortious is not relevant to the inquiry at the special appearance stage of the litigation. *See, e.g.*, *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P*, 493 S.W.3d 65, 73 (Tex. 2016).

made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity"). Additionally, Madison, through Gallaugher, has attended meetings and events in Texas before. Madison may be burdened by having to defend itself in litigation—which Mattress Firm points out would happen regardless of which forum it chose to litigate its claims against Madison—but Madison has not demonstrated that this burden is an unreasonable one. *See Hoagland*, 474 S.W.3d at 816 (stating that defendant bears burden of presenting "compelling case" that Texas's exercise of jurisdiction over it would be unreasonable).

Madison further argues that Texas has "very little interest" in adjudicating the dispute between Madison and Mattress Firm "because the controversy does not arise out of contacts with Texas" and all of the lease agreement Madison and Mattress Firm signed were for retail store locations in other states and provided that disputes concerning the leases would be governed by the law of the state where the store was located. However, as Mattress Firm points out, it is a Texas resident, and Texas "has an obvious interest in providing a forum for resolving disputes involving its citizens, particularly disputes in which the defendant allegedly committed torts in whole or in part in Texas." *See id.*; *see also Moncrief Oil Int'l*, 414 S.W.3d at 155 (noting that burden on Russian defendants in defending against claims in Texas was "somewhat mitigated by the convenience to Moncrief, a Texas resident, of litigating in the forum

where the alleged trade secrets were appropriated and then purportedly used" and that "allegations that the Gazprom Defendants committed a tort in Texas against a resident implicate a serious state interest in adjudicating the dispute"). Furthermore, Mattress Firm sued a total of seventeen defendants: two of the defendants have settled; twelve of the defendants have generally appeared and will be participating in litigation in Texas; and we have held that the other two defendants aside from Madison—Quattro and Liyeos—are subject to specific jurisdiction in Texas. Litigating the claims against Madison along with the claims against the other defendants, particularly against the other similarly situated real estate development company defendants, together in Texas promotes judicial economy. *See Cornerstone*, 493 S.W.3d at 74 (considering facts that several other defendants had not challenged jurisdiction and litigating claims against all defendants together promoted judicial economy).

We conclude that Madison has not presented a "compelling case" that the exercise of specific jurisdiction over it in Texas would be unreasonable such that exercising jurisdiction would offend traditional notions of fair play and substantial justice. *See Moncrief Oil Int'l*, 414 S.W.3d at 154–55 ("If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial

justice."). We hold that the trial court did not err by denying Madison's special appearance.

We overrule Madison's, Quattro's, and Liyeos's issues on appeal.

## Conclusion

We affirm the orders of the trial court denying Quattro's, Liyeos's, and Madison's special appearances.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Goodman, and Countiss.